### MERCHANTS' COAL CO. OF WEST VIRGINIA v. LEONARD.

(Circuit Court of Appeals, Fourth Circuit. December 12, 1910.)

#### No. 972.

PRINCIPAL AND AGENT (§ 89*) — ACTION FOR COMPENSATION — REQUEST TO CHARGE - REFUSAL—EVIDENCE.

In an action to recover commissions on coal sales, evidence *held* to require the granting of a request to charge that if the jury from the evidence believed, at the time a certain contract for the sale of coal was made, plaintiff's employment contract covering the territory in question had been terminated, they should find for defendant.

[Ed. Note.—For other cases, see Principal and Agent, Dec. Dig. § 89.*]

In Error to the Circuit Court of the United States for the Northern District of West Virginia, at Martinsburg.

Action by Frank H. Leonard against the Merchants' Coal Company of West Virginia. Judgment for plaintiff, and defendant brings error. Reversed.

The defendant in error brought an action of assumpsit against the plaintiff in error in the United States Circuit Court for the Northern District of West Virginia in June, 1909, in which a judgment was rendered in favor of the defendant in error for $6,739.17 and costs, and the proceedings of the court below are now here on writ of error for review. This action was based upon a contract between the plaintiff in error and the defendant in error, which

provided that the defendant in error should act for the plaintiff in error in making sales of its coal, and that the defendant in error should receive a proper compensation for his services in bringing about such sales,. and that his services should be confined to sales in the New England states. The second count is on a quantum meruit for work, services, etc., rendered in and about the business of the plaintiff in error before that date. In the bill of particulars attached to the declaration of the defendant in error commissions are claimed for sales made to three different persons and one corporation. With respect to the commissions on the sales to David. Sturtevant, the Murrell Coal Company, and John Wills, the court at the trial of the case decided that the defendant in error was not entitled to recover any of these commissions. It practically confined the case and the consideration of the jury to the commissions on the sales to Archibald McNeill, so that the final judgment is based on the McNeill sales. It was insisted by the defendant in error that he had devoted a large amount of time and trouble in an effort on his part to procure a very important and valuable contract for the sale by the plaintiff in error to McNeill of 250,000 tons of its coal, and that this contract was brought about by means of continuous efforts on the part of the defendant in error, and after the contract was entered into between McNeill and the plaintiff in error a very large proportion, amounting to something over 200,000 tons, of the coal included in this contract was delivered by the plaintiff in error to McNeill in different quantities and extending over a considerable period of time. It was insisted by the plaintiff in error, among other things, that the McNeill contract of 250,000 tons was wholly made after the agree-. ment of the defendant in error with the plaintiff in error as to New England sales had terminated.

Joab H. Banton (P. J. Crogan, on the brief), for plaintiff in error. Henry M. Russell, for defendant in error.

Before PRITCHARD, Circuit Judge, and McDOWELL and ROSE, District Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). Under the fifth assignment of error, among other things, it is insisted that the court below erred in refusing to grant the following instruction:

"The court instructs the jury that if they believe from the evidence that what is known as the McNeill contract of 250,000 tons was wholly made after the plaintiff Leonard's agreement with the defendant had terminated as to New England sales, then they must find for the defendant."

This request for an instruction presented the question as to whether the McNeill contract for the purchase of 250,000 tons was wholly made after the agreement of the defendant in error with the plaintiff in error as to New England sales had terminated. It is insisted by counsel for plaintiff below that there was no evidence upon which to base this instruction, and that, inasmuch as the plaintiff had testified that the contract for New England sales had not terminated at the time the McNeill contract was entered into the court acted properly in refusing to grant the same.

Witness Boswell, president of the defendant company below, among other things, testified as follows:

"Q. When did you notify Mr. Leonard that he could not sell coal any longer in the New England states?

"A. It was some time in March, 1902, or about the 1st of April. I would imagine it was about the 1st of March, just before the Murrell Coal Company was formed.

"Q. How did you communicate with him?

"A. I wrote him to his office in New York, and in a few days time Mr. Leonard came to my office in Baltimore and went over the matter fully.

"Q. Now, when you say you went over the matter fully, what was said?

"A. That we couldn't allow him to sell in the New England states any longer; that we were going to appoint the Murrell Coal Company as our representative, but that I would allow him a certain figure per ton for looking after the shipments of coal in New York Harbor; also, so much per ton for coal that was furnished on our bunker contracts in New York. I think the price for looking after the shipments in New York Harbor was 2 cents per ton, the same as we were allowing Mr. John Wills in Philadelphia at that time, and said that in not allowing him to sell coal in the New England states would not be such a great loss as I thought could be made up by bunker business.

"Q. What is bunker business?

"A. It is supplying coal to foreign steamers for steam purposes, stating at the same time that the Murrell and Crocker agents had contracted for bunkering a large number for foreign steamers.

"Q. Well, what did he say to that?

"A. He seems to be satisfied with it, and accepted it right along, as statements will show.

"Q. Your company received statements after that covering the items as you have testified to?

"A. Yes; each month he was paid promptly, and often in advance.

"Q. Now, Mr. Boswell, was that conversation you had with him before you visited Mr. Archibald McNeill at Bridgeport?

"A. Yes, sir."

Later on the witness testified as follows:

"Q. I show you a paper, and ask you if you can fix the exact date?

"A. Yes, sir; on the 16th day of April, 1902. Yes, sir; that's right.

"Q. Had Mr. Leonard prior to that ever told you Mr. McNeill wanted 250,-000 tons of coal?

"A. Mr. Leonard has had up with me I suppose, and at different times, about supplying Mr. McNeill with large quantities of coal.

"Q. I mean as to this particular shipment, was anything ever said?

"A. No, sir; nothing ever said about 250,000 tons, because I didn't know anything about it when I went to Bridgeport to see Mr. McNeill."

This evidence flatly contradicts the evidence of the plaintiff as to the time when the contract for New England sales was terminated, and tends to show that the contract for the large purchase of coal by McNeill was made some time after the contract between the plaintiff and defendant had terminated. If, as the defendant contends, the contract under which plaintiff had been acting as agent of the defendant for the sale of coal had terminated, we are of opinion that, in the absence of a new contract authorizing the plaintiff to act as its agent in procuring sales, the plaintiff would not be entitled to recover for any services which he may have rendered under such circumstances. It appearing that the evidence as to this point was conflicting, it became important for the jury, among other things, to determine as to whether the contract in question was entered into before or after the termination of the contract for New England sales. In view of the evidence, we think the court should have granted this instruction, and that its refusal to do so was prejudicial to the rights of the defendant.

We think that the other assignments of error, which relate to the refusal of the court below to grant the special instructions tendered by the defendant, are without merit. We do not wish to be under-

stood as holding that the defendant was not entitled to have the court instruct the jury on the points involved therein; but we are of opinion that the instructions in question were not framed so as to fairly present the issues sought to be raised. These intructions, as requested, were calculated to confuse and mislead, rather than aid the jury in arriving at a just conclusion.

The decision of the lower court is reversed, and the case remanded, with directions to grant a new trial, and for further proceedings in accordance with the views herein expressed.

Reversed.